IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE ON BEHALF OF BROOKLYNN H. V. JOSEPH B.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA ON BEHALF OF BROOKLYNN H., A MINOR CHILD, APPELLEE,

v.

JOSEPH B., APPELLANT, AND CHARLOTTE H., APPELLEE,
AND PHILIP B. AND MARIA B., INTERVENORS-APPELLEES.

Filed November 5, 2024.    No. A-23-833.

Appeal from the District Court for Otoe County: JULIE D. SMITH, Judge. Affirmed.

Joseph B., pro se.

No appearance for appellees.

RIEDMANN, Chief Judge, and MOORE and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Joseph B. and Charlotte H. are the parents of Brooklynn H. Joseph has been incarcerated since shortly after Brooklynn's birth in 2011. In August 2017, the Otoe County District Court granted Joseph's parents visitation with Brooklynn, during which time Joseph was permitted to have unlimited telephone contact with his daughter. When Charlotte began denying the grandparents their visitation, thus precluding Joseph from exercising his telephone contact with Brooklynn, Joseph sought various relief from the district court, including two separate contempt actions.

In April 2023, the district court found Charlotte in contempt, and when she failed to comply with the court's purge order, Charlotte was ordered to serve 3 days in jail. Joseph filed a second contempt action alleging that since the court's previous contempt order, Charlotte had denied visitation on six different visitation dates. The court entered an order in September 2023 finding

- 1 -

Charlotte in contempt for willfully denying visitation on one of those six occasions. Her sanction was an admonishment that she require and not simply encourage Brooklynn to attend all court-ordered visitation. Additionally, when the grandparents called the day before a scheduled visit, Charlotte was ordered to return their call within 5 hours.

Joseph, pro se, appeals, claiming the district court erred in receiving certain evidence, denying his request for visits at the correctional facility, denying a motion to continue, failing to find more incidents of contempt, and failing to adequately sanction Charlotte. Finding no error, we affirm.

## II. BACKGROUND

In August 2017, the district court granted Joseph's parents, Maria B. and Philip B., visitation with Brooklynn every other weekend from Saturday evening to Sunday evening and every year on Father's Day. Joseph was allowed to have unlimited telephone contact with Brooklynn when she was visiting with his parents. Charlotte began denying visitation to Joseph's parents, thus interfering with Joseph's rights to his telephone visitation with Brooklynn. Joseph began filing numerous requests for relief.

### 1. FIRST CONTEMPT ACTION

Although not contained in our record, Joseph filed a contempt action against Charlotte for failing to abide by the 2017 visitation order on numerous dates in 2021 and 2022. We know this because on April 3, 2023, the district court entered an order finding Charlotte in contempt of court for denying visitation on numerous dates in 2022, but not other dates in 2021. She was sentenced to 21 days in jail but could "purge herself of the contempt sanction by abiding by the terms of the grandparent visitation order between the date of this order and September 15, 2023." The court verbally instructed Charlotte, "[J]ust make sure that you're not denying any grandparent visitation between now and September 15th. If you do, one of the other parties can file an affidavit with the court and you would actually have to serve the jail term."

On April 11, 2023, Joseph, pro se, filed a "Motion to Execute Sentence," alleging that Charlotte "again defied the Court's Orders" on April 8 by denying his parents their visitation, which also denied Joseph his telephone visitation with his daughter. Joseph requested that the district court enter an order "executing the 21-day jail sentence on . . . Charlotte . . . for her willful failure to abide" by the court's order. Joseph filed another such motion on August 24, seeking the same relief, but adding further alleged denials of visitation on April 22, May 6, May 20, and June 3. A hearing took place on September 14, with the court informing the parties that "this hearing is on whether the mother should have to serve the jail term pronounced by the Court on April 3rd or whether she has been in strict compliance with the custody order." The court received evidence "in the form of affidavits." Joseph offered several exhibits, including affidavits from his parents, his sister, and himself. Charlotte's counsel offered exhibit 16 (Charlotte's affidavit) and re-offered some previously received exhibits. Joseph objected, "doing . . . kind of blanket objections" because he had not "looked at them" and had not "received anything yet." Brooklynn's guardian ad litem offered her own affidavit, marked as exhibit 17. Joseph made the same "blanket objections" because he had not received it yet. All exhibits were received "subject to the rules of evidence."

The court further advised that any exhibits or portions thereof containing statements that were irrelevant, lacked foundation, or constituted hearsay would be disregarded.

The district court reminded the parties that the April 3 order sentenced Charlotte to 21 days in jail beginning "tomorrow at 9 a.m." but that Charlotte "could purge herself of having to go to jail by strictly complying with the terms between April 3rd and September 15th." The court indicated that it would read the exhibits that morning and "if the Court grants the motion to execute the jail sentence, the clerk will also issue a commitment for the sheriff's office, and [Charlotte will] be required to report to jail tomorrow morning at 9 a.m." The court suggested to Charlotte that she fill out an application for work release "sooner than later in case the Court grants the motion." The court inquired where Brooklynn would stay if Charlotte was ordered to jail; Charlotte indicated that Brooklynn would stay with a friend. At that point, Joseph requested that temporary custody be placed with his parents "because they're next of kin." Charlotte's counsel objected to the request, indicating that it was "not properly before the Court and not within the contempt action."

On September 14, 2023, the same day as the hearing, the district court entered an order granting Joseph's request to "execute sentence," as modified. The court concluded that during the period of the purge order, from April 3 to September 15, Charlotte denied visitation on April 8. Although the court noted that Charlotte "encouraged" Brooklynn to go with her grandparents that day, "[w]hether to follow the court order is not Brooklynn's decision." The court added, "The mother has a duty to do more than encourage Brooklynn to go on visits – she needs to require it." As for the other dates noted (April 22, May 6, May 20, June 3), the court found that while the grandparents said Charlotte denied or refused their visitation on those dates, they did not indicate how she did so. Whereas Charlotte indicated that the grandparents never showed up to get Brooklynn on any of those weekends. Further, the court pointed out that the grandparents had their visits with Brooklynn on Father's Day weekend and on June 24, although June 24 "was not without incident." The court observed that the grandparents alleged that Charlotte interfered with the June 24 visit; the guardian ad litem requested that grandparent visitation be suspended after that visit. (The record reflects that the court entered an order on July 26 denying the guardian ad litem's request to suspend visitation.) The court also noted that according to Charlotte, since the July 26 order, the grandparents canceled or refused visitation. Charlotte claimed to have called them prior to each visit and "[e]ach time they have said 'no' and hung up." Charlotte indicated she waited 20 minutes at their meeting place and they did not show up. Charlotte provided a copy of a telephone call log allegedly reflecting calls between her phone and Joseph's mother's phone. The court noted that the grandparents' affidavits were "silent" as to those visits.

The district court concluded that "it would be unjust to have [Charlotte] serve the entire 21 days in jail when it appears that (at least for recent visits), the grandparents haven't been showing up to pick up Brooklynn." It then sentenced Charlotte to 3 days in jail, commencing on September 15. The court also denied Joseph's request for his parents to have temporary custody of Brooklynn while Charlotte was in jail.

## 2. SECOND CONTEMPT ACTION AND MOTION
### FOR VISITS AT CORRECTIONAL FACILITY

After the district court entered the first contempt order on April 3, 2023, Joseph filed another contempt action on April 11. He filed amendments on June 12, and then again on July 24. The July 24 "Second Amended Application for Order to Show Cause" alleged that Charlotte "knowingly and intentionally" denied or refused visitation on April 8, April 22, May 6, May 20, June 3, and June 24.

On August 7, 2023, Joseph filed a "Motion for Visits at Correctional Facility." He alleged that Charlotte had been found in contempt of court on April 3, and that Charlotte "directed, or aided and [abetted] . . . Brooklynn during a grandparent visit on June 24, 2023, to engage in unlawful and unsafe acts or false reporting to law enforcement and running away from the [grandparents'] home to be picked up by Charlotte." Joseph claimed that due to Charlotte's interference with visitation and her "alienating Brooklynn from her biological father and grandparents," that it would be in Brooklynn's best interests "for all future visits with her father and grandparents to occur at the correctional facility." Citing to *Martin v. Martin*, 294 Neb. 106, 881 N.W.2d 174 (2016), Joseph asserted that the court had the authority to modify a parenting plan in a contempt action.

A hearing on the motion was held on September 11, 2023. At that time, Charlotte's counsel represented to the district court that a complaint to modify had been filed that morning that "would be a better vehicle to address [Joseph's] motion for visit[s] at the correctional facility." Citing to *Martin v. Martin, supra*, the court stated:

> [*Martin v. Martin, supra*] gives a district court some leeway to modify a parenting plan during a contempt action. That is typically done at disposition or if the Court finds that the accused is not in contempt but there is some tweaking that can be done on the parenting plan to resolve some issues. [*Martin*] says that the Court can do that.
>
> What we have is, essentially, a Motion for Visits at Correctional Facility which is akin to a motion for temporary orders. It was filed when there was no Complaint to Modify on file, and it does not directly relate to the contempt.
>
> Furthermore, we've already had disposition on the first contempt case and there has been no final hearing on the second contempt case. It is not appropriate for the [c]ourt to issue a temporary order at this point.
>
> Now, there is a Complaint to Modify on file today. . . . The Court can issue a temporary order within the action on the Complaint to Modify, but this motion predates the Complaint to Modify . . . by about one month. The objection is sustained. The Motion for Visits at Correctional Facility is denied. Again, it was filed when there was no Complaint to Modify on file.

On September 25, 2023, the hearing took place on Joseph's second contempt action. Joseph, appearing by videoconference, made an oral motion to continue the hearing because he was waiting on "some more stuff" (referring to Brooklynn's medical records). The record reflects that a month prior, Joseph filed a notice of intent to serve a subpoena on a health care provider to produce "any and all mental health counseling, psychological, and/or psychiatric records

pertaining to Brooklynn." Although the health care provider was served on September 18, Joseph reported that he had not yet received the records. Charlotte's counsel objected to the continuance because Charlotte "[had] to take off work to come to court" that day. He also objected on relevance grounds, arguing, "This is a therapist that Brooklynn just started seeing at the request of the guardian ad litem. . . . [Joseph] has the -- the report already. I don't think he's going to get anything additional through his subpoena." When the district court questioned Joseph about the relevance of Charlotte's medical records to the contempt action, Joseph explained that he needed the records for "impeachment," but he did not provide any details or further explanation.

Joseph also argued that his continuance should be granted because he was "going to be filing a motion in limine" regarding an affidavit he had "just received." The district court asked Charlotte's counsel if he intended to introduce the affidavit at trial, and Charlotte's counsel said that he did not. The court therefore concluded the motion in limine was a moot issue.

The district court denied Joseph's request for a continuance. It found that while Brooklynn's medical records might be relevant for a custody modification or "if we were here today on any type of a motion to change parenting time," it would grant the continuance. But it pointed out that "we're here today on a very narrow issue," which was whether Charlotte was in contempt for failing to provide visitation. The court then informed Joseph that he could begin presenting his evidence.

In addition to his own testimony, Joseph called his mother, his sister, and Charlotte to testify at the hearing. Charlotte testified in her own behalf as well. We summarize the evidence related to each of the 6 days Joseph claimed visitation was denied.

### (a) April 8, 2023

The parties agreed that the April 8, 2023, visit did not occur. Joseph's mother, Maria, testified that she called Charlotte before the visit, but Charlotte did not answer. She left a voicemail stating that she would "come and pick up Brooklynn on Saturday, 12 o'clock." When Maria and her husband attempted to pick up Brooklynn on April 8, Charlotte allegedly said, "No, [Brooklynn's] not going with you." Maria said that she did not ask Brooklynn to get into their vehicle because Brooklynn was "busy playing." The grandparents then went to the police station to report the incident. Later that day, Maria received a text message from Charlotte that read, "[Y]ou [sic] wasting your time coming here. She's not going with you." Maria was adamant that she received Charlotte's text *after* going to Charlotte's house.

Charlotte testified that when the grandparents arrived at her house on April 8 to pick up Brooklynn, she told them that Brooklynn did not want to go with them and "asked them to talk to her." However, they "refused to talk to [her]." Charlotte admitted that Brooklynn did not go with her grandparents that day but that she "encouraged" her to go.

### (b) April 22 to June 3, 2023

The parties also agreed that the visits scheduled for April 22, May 6, May 20, and June 3, 2023, did not occur. On direct examination by Joseph, his mother testified that for each of those visitation dates, she called Charlotte to make arrangements to pick up Brooklynn, but that "[m]ost of the time she does not answer." According to Maria, she would leave a voicemail if there was no answer. Maria claimed that Charlotte did not call back.

During cross-examination, Charlotte's counsel asked Maria if she went to Charlotte's house to pick Brooklynn up on April 22.

[Charlotte's counsel]: Did you go to Nebraska City to pick up Brooklynn on April 22nd?

[Maria]: Yes, I -- I think I remember I went to pick her up.

[Charlotte's counsel]: You think you did or you don't know?

[Maria]: Yes, I think I did.

. . . .

[Charlotte's counsel]: Do you know for sure if you and [Philip] went to Nebraska City to pick up Brooklynn on April 22nd?

[Maria]: Yes.

Maria then testified that when she knocked on Charlotte's door on April 22, no one answered. Charlotte's counsel asked if she called Charlotte, to which she responded, "I think I did." Regarding the May 6 visit, Maria claimed that she once again went to Charlotte's house and knocked, but no one answered. When asked if she called Charlotte, she gave the same response: "I think I did."

Charlotte admitted that the visits between April 22 and June 3, 2023, did not occur but claimed that the grandparents did not show up to pick up Brooklynn on any of those weekends. She testified that she and Brooklynn were home at noon on each of the scheduled visits. Charlotte's counsel asked her, "So if [Maria] testified -- if she testified that they went there and Brooklynn wasn't there or you weren't there or no one answered the door, that would be incorrect?" Charlotte replied, "Yes."

(c) June 24, 2023

The grandparents received their visitation on June 24, 2023. However, Brooklynn ran away during the visit. Brooklynn was eventually picked up by Joseph's sister, and the visit continued for the remainder of the scheduled time. Joseph's mother admitted that after Brooklynn returned home, she had "the rest of [her] visit until . . . noon the next day." Charlotte testified that she was texting and making phone calls with Brooklynn on June 24. However, she claimed that she did not tell Brooklynn to call 911 or run away. She also testified that she did not try to pick up Brooklynn from her visit early because the grandparents told her she could not. Charlotte picked up Brooklynn at noon the next day as scheduled.

Joseph testified,

[O]n June 24th, 2023, I called my mom's phone and my dad answered. And he said that it wasn't a good time to talk because Charlotte directed Brooklynn to call 911 and run away. That was in the afternoon.

. . . .

And again, I called the next day in the morning. That would have been the -- let's see, the 25th. And I asked if I could speak with Brooklynn. And my dad said it wasn't one of the good times to talk. You know he -- because of what had happened, I guess, for Charlotte directing Brooklynn to run away and call 911, and stuff, so I wasn't able to speak with Brooklynn at that time either.

(d) District Court's Order

On September 25, 2023, the district court entered an order finding that Charlotte was in willful contempt of court for withholding visitation on April 8. The court stated, "[M]erely encouraging Brooklynn to attend" visits and "ultimately leaving the decision to Brooklynn, is not enough." However, the court observed that Charlotte had recently served 3 days in jail on the prior contempt action and the court "hope[d] the three (3) days in jail [would] serve as a wake-up call for [Charlotte] that she needs to require Brooklynn to attend grandparent visitation." As a sanction, the court admonished Charlotte, ordering her to "require (not merely encourage) Brooklynn to attend all court-ordered grandparent [visitation]" and warned her that "failure to do so [could] result in being jailed on future contempt actions." The court also ordered that when the grandparents call the day before a scheduled visit and Charlotte does not answer at that time, then Charlotte was required to return the call within 5 hours.

Regarding the April 22, May 6, May 20, and June 3 visits, the district court stated:

[T]he father failed to meet his burden of proving that the mother was in willful contempt by clear and convincing evidence. [Maria] was unable to clearly recall what had occurred on specific dates. There is conflicting evidence on whether the [grandparents] attempted to retrieve Brooklynn each of these dates. The burden of proof on a contempt action is a high burden, as it may result in jail time for the accused. While the father has proven that grandparent visitation did not occur on April 22, May 6, May 20, and June 3, he failed to prove that this was the result of the mother being in willful contempt of the Court's orders.

The district court further held that Charlotte was not in contempt for the June 24, 2023, visit because "[d]espite an interruption when Brooklynn ran away," the grandparents received their visit.

Joseph, pro se, filed a notice of appeal on October 20, 2023.

## III. ASSIGNMENTS OF ERROR

Joseph assigns, reordered and restated, that the district court erred in (1) "not executing the entire originally ordered jail sentence upon [Charlotte]," (2) receiving exhibits 16 and 17, (3) denying his motion for visits at the correctional facility, (4) denying his motion to continue, (5) finding that there was insufficient evidence for "Counts II through VI of the show cause application," and (6) "only admonishing [Charlotte] as a sanction to Count I of the show cause application."

No other party filed a brief in response to Joseph's appeal.

## IV. STANDARD OF REVIEW

In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which (1) the trial court's resolution of issues of law is reviewed de novo, (2) the trial court's factual findings are reviewed for clear error, and (3) the trial court's determinations of whether a party is in contempt and of the sanction to be imposed are reviewed for abuse of discretion. *Braun v. Braun*, 306 Neb. 890, 947 N.W.2d 694 (2020).

Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Boswell*, 316 Neb. 542, 5 N.W.3d 747 (2024). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

A motion for continuance is addressed to the discretion of the court, and in the absence of a showing of an abuse of discretion, a ruling on a motion for continuance will not be disturbed on appeal. *State v. Billingsley*, 309 Neb. 616, 961 N.W.2d 539 (2021).

V. ANALYSIS

1. NOT EXECUTING ENTIRE JAIL SENTENCE
IN FIRST CONTEMPT ACTION

Joseph asserts that the district court erred in sentencing Charlotte to 3 days in jail in the first contempt action rather than the originally imposed 21 days. In its September 14, 2023, order, the court found that "it would be unjust to have [Charlotte] serve the entire 21 days in jail when it appears that (at least for recent visits), the grandparents haven't been showing up to pick up Brooklynn." Joseph claims the court "lacked authority under res judicata and law-of-the-case doctrine to reduce Charlotte's 21-day jail sentence." Brief for appellant at 18.

However, any alleged errors stemming from the September 14, 2023, order cannot be addressed in this appeal. The present appeal was filed on October 20, which was within 30 days of the September 25 final order in the second contempt action but was not within 30 days of the September 14 order in the first contempt action. We therefore have no jurisdiction over issues pertaining to the September 14 order. See Neb. Rev. Stat. § 25-1912(1) (Cum. Supp. 2022) (notice of appeal must be filed within 30 days after entry of judgment, decree, or final order).

2. EXHIBITS 16 AND 17

Joseph claims that the district court erred in receiving exhibits 16 (Charlotte's affidavit) and 17 (the guardian ad litem's affidavit). However, these exhibits were received at the September 14, 2023, hearing on Joseph's motion to execute sentence; the order sentencing Charlotte to 3 days in jail on the first contempt action was entered the same day. As just discussed, no appeal was timely filed from that order and therefore any error related to the court's receipt of those two exhibits cannot be addressed in the present appeal.

3. MOTION FOR VISITS

Joseph contends the district court erred in denying his motion for visits at the correctional facility. The court acknowledged the ability to modify a parenting plan during a contempt action, but denied Joseph's motion after determining that in this instance the requested relief did not directly relate to the contempt proceeding.

Contempt proceedings may both compel obedience to orders and administer the remedies to which the court has found the parties to be entitled. *Yori v. Helms*, 307 Neb. 375, 949 N.W.2d 325 (2020). Where a situation exists that is contrary to the principles of equity and which can be redressed within the scope of judicial action, a court of equity will devise a remedy to meet the situation. *Martin v. Martin*, 294 Neb. 106, 881 N.W.2d 174 (2016). Neb. Rev. Stat. § 42-364.15

(Reissue 2016) sets forth methods by which a court may enforce its child support and custody orders. The statute provides, in relevant part:

> In any proceeding when a court has ordered a parent to pay, temporarily or permanently, any amount for the support of a minor child and in the same proceeding has ordered parenting time, visitation, or other access with any minor child on behalf of such parent, the court shall enforce its orders as follows:
>
> (1) Upon the filing of a motion which is accompanied by an affidavit stating that either parent has unreasonably withheld or interfered with the exercise of the court order *after notice to the parent and hearing*, the court shall enter such orders as are reasonably necessary to enforce rights of either parent including the modification of previous court orders relating to parenting time, visitation, or other access.

(Emphasis supplied).

In *Martin v. Martin, supra*, the district court modified a parenting plan following a contempt hearing. On appeal, the Nebraska Supreme Court found that a motion to show cause gave the custodial parent notice that she could be found in contempt for denying parenting time, which also gave her notice of a possible modification pursuant to § 42-364.15. It further explained that once notice was given as required by the statute, the district court had the equitable authority, within the confines of the contempt proceeding, to modify the parenting plan as it related to issues that caused the finding of contempt.

In the present case, Joseph's motion for visits at the correctional facility was filed *after* the disposition of his first contempt action and *before* a hearing on his second contempt action. As observed by the district court at the September 11, 2023, hearing, Joseph's motion was "akin to a motion for temporary orders. . . . when there was no Complaint to Modify on file, and it does not directly relate to the contempt." We agree that Joseph's requested relief did not directly relate to the underlying contempt action. The contempt action related only to Charlotte's denial of visitation, not problems with where the visitation was taking place. Changing the location for visitation was not reasonably necessary to enforce Joseph's rights to his telephone visitation with Brooklynn. The only remedy needed to meet the current situation was to make it clear to Charlotte that she was required to make Brooklynn available for court-ordered visitation, not simply encourage her to do so. It was unnecessary to change where visitation took place in order to resolve the allegations in Joseph's second contempt action; therefore, we find no abuse of discretion in the court's decision denying Joseph's request.

### 4. MOTION TO CONTINUE

Joseph claims that the district court abused its discretion by denying his request for a continuance at the September 25, 2023, hearing on his second contempt action.

A motion for continuance is addressed to the discretion of the court, and in the absence of a showing of an abuse of discretion, a ruling on a motion for continuance will not be disturbed on appeal. *State v. Billingsley*, 309 Neb. 616, 961 N.W.2d 539 (2021). We are to consider three analytical factors when reviewing a trial court's denial of a motion for continuance: (1) the number of continuances granted to the moving party, (2) the importance of the issue presented in the matter,

and (3) whether the continuance was being sought for a frivolous reason or a dilatory motive. See *Velehradsky v. Velehradsky*, 13 Neb. App. 27, 688 N.W.2d 626 (2004).

Joseph argues that his continuance should have been granted because he had not received his requested discovery from Brooklynn's medical provider. However, he fails to specify how those records were relevant to the contempt action. He only asserts that he needed the records for "impeachment," but provides no detail as to who would be impeached with information contained in Brooklynn's medical records or how those records would be relevant to whether Charlotte intentionally withheld visitation. As the district court indicated, the contempt hearing involved only the narrow issue of whether visitation was withheld.

Joseph also argues that the district court erred in denying his continuance because his father, Philip, was unavailable to testify on September 25, 2023, due to a doctor's appointment. However, Joseph did not discuss Philip's availability with the district court when explaining why he wanted a continuance. Rather, the record reflects that after Joseph's witnesses had testified and the court asked if Joseph had any additional witnesses or evidence, Joseph said, "I don't know if my dad is available or not. I don't know if he's, like, not – he's not there then?" The court replied that Philip was not there. Joseph responded, "I thought I might get a continuance. That's why he is probably not there." Joseph did not argue to the trial court that Philip was necessary to his case or his request for a continuance.

As such, we consider only that Joseph requested a continuance based on not yet receiving Brooklynn's medical records, which he only vaguely explained were needed for "impeachment." Because of the narrow issue presented at the contempt hearing regarding whether Charlotte intentionally withheld visitation on the dates at issue, we conclude the district court did not abuse its discretion in denying Joseph's motion for a continuance.

### 5. CONTEMPT FINDINGS

Joseph challenges the district court's contempt findings. He argues that the court erred in concluding that he did not meet his burden of proof for finding Charlotte in contempt on April 22, May 6, May 20, June 3, and June 24, 2023 ("Counts II through VI of the show cause application," brief for appellant at 6).

Civil contempt proceedings are instituted to preserve and enforce the rights of private parties to a suit when a party fails to comply with a court order made for the benefit of the opposing party. *Becher v. Becher*, 311 Neb. 1, 970 N.W.2d 472 (2022). Willful disobedience is an essential element of contempt; "willful" means the violation was committed intentionally, with knowledge that the act violated the court order. *Martin v. Martin*, 294 Neb. 106, 881 N.W.2d 174 (2016). Outside of statutory procedures imposing a different standard or an evidentiary presumption, all elements of contempt must be proved by the complainant by clear and convincing evidence. *Id.* Where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

We find no clear error in the district court's factual findings as to these other missed visitation dates. While it is undisputed that grandparent visitation did not occur on April 22, May 6, May 20, and June 3, 2023, Joseph failed to show by clear and convincing evidence that this was the result of Charlotte being in willful contempt of court. There is conflicting evidence regarding

whether the grandparents actually attempted to pick up Brooklynn on these dates. Charlotte testified that, other than the April 8 visit, the grandparents never attempted to get Brooklynn for visitation. Charlotte also claimed she was at home with Brooklynn at noon on each of those dates, so she would have heard a knock on her door.

Joseph's mother initially testified that she did not receive visitation on April 22, May 6, and May 20, 2023, without offering any explanation as to why. Joseph did not ask -- and she did not indicate -- whether she received grandparent visitation on June 3. Later, during cross-examination, she was asked if she went to pick up Brooklynn on April 22. She responded, "Yes, I -- I think I remember I went to pick her up." She was then asked, "You think you did or you don't know," to which she responded, "I think I did." Finally, when asked if she was sure that she attempted to pick up Brooklynn, she said, "Yes." She claimed that when she arrived at Charlotte's house, Brooklynn was not outside. She said that she knocked on Charlotte's door, but no one answered. She also claimed that she attempted to pick up Brooklynn on May 6. Once again, she said that she knocked on Charlotte's door, but no one answered. The district court found that Maria "was unable to clearly recall what had occurred on specific dates." The record reflects that Maria appeared to be uncertain at several points throughout her testimony and contradicted herself multiple times. Joseph offered no other evidence to show that Charlotte was in willful contempt for withholding visitation on April 22, May 6, May 20, and June 3.

Regarding the June 24, 2023, visit, Joseph did not receive telephone visitation because Philip, not Charlotte, denied it. Joseph testified that he called his father on June 24 and 25, but his father indicated it was not a good time to talk to Brooklynn due to the incident (in reference to her running away). Further, the district court was correct in concluding that "[d]espite an interruption when Brooklynn ran away," the grandparents received their visit. The record indicates the incident lasted less than 2 hours, and Charlotte picked up Brooklynn at noon on June 25 as scheduled.

We conclude that the district court did not abuse its discretion in finding that Joseph failed to prove that Charlotte willfully withheld grandparent visitation on April 22, May 6, May 20, June 3, and June 24, 2023, by clear and convincing evidence.

### 6. SANCTION OF ADMONISHMENT

Regarding the second contempt action, Joseph argues that the district court "only sympathetically 'admonished' Charlotte as a sanction," and that her "sanction should have been at least equal to, if not greater than, her prior sanction for the first contempt action given the circumstances." Brief for appellant at 25. He contends the admonishment for "Count I" (April 8, 2023, violation) is "excessively lenient" and the "matter must be reversed and remanded with directions for a different judge to sanction Charlotte." Id.

In its September 25, 2023, order, the district court observed that Charlotte had served 3 days in jail because she failed to purge herself of the first contempt action when she withheld visitation on April 8. It further stated,

> The Court hopes the three (3) days in jail will serve as a wake-up call for [Charlotte] that she needs to require Brooklynn to attend grandparent visitation. As a sanction, the mother is admonished that she must require (not merely encourage) Brooklynn to attend all court-ordered grandparent parenting time and that failure to do so may result in being jailed on future contempt actions.

The court further ordered Charlotte to answer the grandparents' telephone calls on the day before a scheduled visit, and if she "is truly unable to answer," then she shall return the call within 5 hours.

A civil sanction is coercive and remedial; the contemnors carry the keys of their jail cells in their own pockets, because the sentence is conditioned upon continued noncompliance and is subject to mitigation through compliance. *Becher v. Becher*, 311 Neb. 1, 970 N.W.2d 472 (2022). Whether a party is in contempt and the sanction to be imposed are reviewed for an abuse of discretion. See *Braun v. Braun*, 306 Neb. 890, 947 N.W.2d 694 (2020).

The district court's decision aligns with the nature of civil contempt. It provides an opportunity for Charlotte to rectify her noncompliance without imposing unnecessary punitive measures. We therefore conclude that the district court did not abuse its discretion in admonishing Charlotte as a sanction.

## VI. CONCLUSION

For the foregoing reasons, we affirm the district court's September 25, 2023, order on Joseph's second contempt motion.

AFFIRMED.